# UNITED STATES DISTRICT COURT
# DISTRICT OF MINNESOTA

UBS SECURITIES LLC,

       Plaintiff,

v.                               **MEMORANDUM OF LAW & ORDER**
                                   Civil File No. 12-2090 (MJD/JJG)

ALLINA HEALTH SYSTEM,

       Defendant.

Terrence Fleming and Sharda R. Kneen, Lindquist & Vennum PLLP and Jonathan K. Youngwood and Paul C. Gluckow, Simpson Thacher & Bartlett LLP, Counsel for Plaintiff.

James R. Swanson, Joseph C. Peiffer, Jason W. Burge, Fishman Haygood Phelps Walmsley Willis & Swanson, LLP and Michael M. Krauss, Faegre Baker Daniels LLP, Counsel for Defendant.

## I. INTRODUCTION

This matter is before the Court on Plaintiff's Motion for Preliminary Injunction. [Docket No. 8] The Court heard oral argument on November 21, 2012. Because Plaintiff cannot show that it is likely to succeed on the merits, the Court denies Plaintiff's motion for a preliminary injunction.

1

## II. BACKGROUND

### A. Factual Background

#### 1. The Parties

Plaintiff UBS Securities LLC ("UBS") is a registered brokerage firm with a principal place of business in Stamford, Connecticut. (Ex. C to Jonathan K. Youngwood Decl., Statement of Claim ¶ 22; Compl. ¶ 7.) UBS is a member of The Financial Industry Regulatory Authority ("FINRA"). (Statement of Claim ¶ 23.) Defendant Allina Health System ("Allina") is a Minnesota nonprofit corporation that delivers health care services to patients in Minnesota and western Wisconsin. (Statement of Claim ¶ 21; Compl. ¶ 8.) Allina controls and operates eleven hospitals, including urban tertiary care, suburban community, and rural hospitals. (Statement of Claim ¶ 21.)

#### 2. Allina's 2007 Issuance of Auction Rate Securities

In May 2007, Allina sought to issue approximately $475 million in bonds to refinance outstanding debt and to finance the remodeling, renovation, and routine upgrades of its facilities and technology. (Statement of Claim ¶ 1; Compl. ¶¶ 14-15.) Allina engaged UBS as an underwriter to assist Allina in "designing and executing an optimal structure" for the bond issuance. (Laurie Lafontaine Decl. ¶ 3.) UBS prepared various presentations regarding possible

2

financing structures for Allina. (Exs. B, C, D to Lafontaine Decl.) UBS recommended that Allina issue a type of variable rate bond called "auction rate securities" ("ARS"). (Exs. B, C, D to Lafontaine Decl.)

ARS are bonds or preferred securities that pay interest or dividends at rates set at periodic auctions. (Compl. ¶ 16.) As described in UBS's complaint:

> Investors or prospective investors place bids at the auctions, and the lowest rate at which there are sufficient bids to purchase all of the securities offered for sale at auction is the 'clearing rate,' or the rate at which the securities will earn interest until the next auction. If there are not enough bids to purchase all of the securities offered for sale, the auction 'fails,' and the securities earn interest until the next auction pursuant to a predetermined 'maximum rate' set forth in the bonds' offering documents.
> Issuers of ARS contract with financial institutions to serve as broker-dealers for the ARS. These broker-dealers are authorized to accept purchase or sell orders from current or prospective ARS investors. The broker-dealers then submit these orders to the auction agent which, in turn, calculates the interest or dividend rate until the next auction.

(Compl. ¶¶ 16-17.)

Allina ultimately issued $475 million of public bonds in October 2007. (Statement of Claim ¶ 44; Compl. ¶ 15.) UBS and Piper Jaffray & Co. served as the underwriters of the bond issuance. (Statement of Claim ¶¶ 24-25; Ex. D to Youngwood Decl., Official Statement at 7.) Among the bonds that Allina issued were approximately $125 million of ARS. (Statement of Claim ¶ 1; Compl. ¶ 15.)

Allina maintains that it issued the ARS bonds in reliance on UBS's recommendation. (Lafontaine Decl. ¶ 10.)

### 3. UBS and Allina's Agreements

In conjunction with the issuance of the $125 million of ARS, UBS and Allina entered into two agreements: (1) the "Bond Purchase Agreement," dated October 5, 2007, and (2) the "Broker-Dealer Agreement," dated October 9, 2007. (Ex. A to Youngwood Decl., Bond Purchase Agreement; Ex. B to Youngwood Decl., Broker-Dealer Agreement.)

Pursuant to the Bond Purchase Agreement, UBS agreed to purchase a portion of Allina's bonds and resell them to the public. (Bond Purchase Agreement at 2.) The Bond Purchase Agreement includes the following forum selection clause:

> Any dispute or claim between the Underwriters and the Corporation arising from or relating to this Purchase Contract, or the breach, termination or invalidity thereof, shall be finally settled by arbitration administered by the American Arbitration Association pursuant to the Commercial Arbitration Rules as then in force, except as modified by the specific provisions of this Purchase Contract.

(Bond Purchase Agreement at 19.)

4

Pursuant to the Broker-Dealer Agreement, UBS agreed to serve as one of the broker-dealers for Allina's ARS issuance. (Ex. B to Youngwood Decl., Broker-Dealer Agreement) The agreement provided UBS with the ability to enter purchase and sell orders at auction on behalf of investors or potential investors in Allina's ARS. (Broker-Dealer Agreement at 3-6.) The Broker-Dealer Agreement also named Wells Fargo Bank, National Association as the auction agent. (Id. at 1.)

The Broker-Dealer Agreement also includes a forum selection clause, which states, in part:

> 5.10 Governing Law; Jurisdiction; Waiver of Trial by Jury
>
> (a) This Broker-Dealer Agreement shall be governed by and construed in accordance with the laws of the State of New York applicable to agreements made and to be performed in said State, without giving effect to principles of choice of law or conflicts of law thereof.
>
> (b) The parties agree that all actions and proceedings arising out of this Broker-Dealer Agreement or any of the transactions contemplated hereby shall be brought in a New York State Court or United States District Court, in each case, in the County of New York and, in connection with any such action or proceeding, submit to the jurisdiction of, and venue in, such County.
>
> (c) Each party to this Broker-Dealer Agreement hereby irrevocably and unconditionally waives, to the fullest extent it may legally and effectively do so, any objection which it may now or

5

> hereafter have to the laying of venue of any suit, action or proceeding arising out of or relating to this Broker-Dealer Agreement in any court referred to in Section 5.10(b) hereof. Each of the parties hereto hereby irrevocably waives, to the fullest extent permitted by law, the defense of an inconvenient forum to the maintenance of such action or proceeding in any such court.

(Broker-Dealer Agreement at 14.)

### 4. Change in the ARS Market

Approximately four months after Allina's October 2007 ARS issuance, the interest rates on Allina's ARS began to increase. (Statement of Claim ¶ 45; Compl. ¶ 27.) UBS maintains that the interest rate increase occurred in connection with the worldwide financial crisis. (Compl. ¶ 27.) Allina maintains that the ARS market collapsed because UBS and other broker-dealers stopped submitting "cover bids" in many auctions. (Statement of Claim ¶ 45.) Allina states that "the ARS market had historically functioned as promoted because broker-dealers like UBS always placed cover bids (also called 'support' bids) in every ARS auction for which they were the lead broker-dealer. That is, UBS placed a bid for the entire outstanding amount of the ARS issue being auctioned to prevent auction failure, regardless of the number of orders that UBS had received from customers." (Id. at ¶ 9.)

6

As a result of this change, Allina maintains that "[t]raditional ARS investors quickly fled the market, and ARS no longer generated short-term interest rates that matched the payments Allina received from its swap counter-party." (Id. at ¶ 45.) Allina maintains it was required to quickly refinance its ARS in June 2008 at considerable cost in refinancing fees and was forced to obtain expensive letters of credit. (Id. at ¶ 46.) Allina also maintains that it lost bond insurance, which resulted in Allina paying higher fixed-rate payments on the bonds. (Id. at ¶ 47.) Allina claims that these additional expenses totaled many millions of dollars. (Id. at ¶ 48.)

### 5. The FINRA Arbitration

In February 2012, Allina filed a Statement of Claim to initiate FINRA arbitration with UBS. (Ex. C to Youngwood Decl., Statement of Claim.) Allina alleged that UBS breached its fiduciary duties to Allina, and stated claims for negligent misrepresentation, fraud, violations of federal and state securities laws, and breaches of NASD and MSRB rules. (Statement of Claim ¶¶ 56-77.)

Allina demanded FINRA arbitration pursuant to FINRA Rule 12200. FINRA Rule 12200 provides:

> Parties must arbitrate a dispute under the Code if:
> - Arbitration under the Code is either:

7

> (1) Required by a written agreement, or
> (2) Requested by the customer;
> - The dispute is between a customer and a member or associated person of a member; and
> - The dispute arises in connection with the business activities of the member or the associated person, except disputes involving the insurance business activities of a member that is also an insurance company.

FINRA R. 12200.  Allina maintains that FINRA has jurisdiction over the arbitration because UBS is a FINRA member, Allina is UBS's customer because it "procured and paid for [UBS's] services as underwriter and as broker-dealer," and the dispute arose from UBS's business activities.  (Statement of Claim ¶ 23.)

UBS's Answer to the Statement of Claim was initially due on April 4, 2012.  (Jason Burge Decl. ¶ 2.)  Allina granted UBS an extension and UBS filed its Answer on June 4, 2012.  (Id.)  The parties submitted their arbitrator ranking forms on May 14, 2012.  (Id. at ¶ 3.)  On June 7, 2012, the arbitrators were appointed.  (Id.)  On June 12, 2012, Allina served discovery requests to UBS, and UBS responded on August 13, 2012.  (Id.)  On July 10, 2012, UBS propounded discovery requests to Allina and Allina responded on September 7, 2012.  (Id.)

On July 25, 2012, UBS and Allina participated in an initial telephonic conference with the FINRA Panel.  (Burge Decl. ¶ 3; Second Youngwood Decl. ¶ 7.)  During this call, the parties scheduled evidentiary hearings for August 5-

13, 2013. (Burge Decl. ¶ 3.) Also during this call, UBS asserted the position that FINRA lacked jurisdiction to adjudicate Allina's claims. (Youngwood Decl. ¶ 6; Second Youngwood Decl. ¶ 7.) The Panel provided that any challenges to jurisdiction should be initiated within 30 days of the Scheduling Order. (Ex. E to Youngwood Decl., Initial Pre-Hearing Conference Scheduling Order.) The deadline for jurisdictional challenges was August 25, 2012. As of the filing of UBS's motion for a preliminary injunction, no other conferences with the FINRA Panel occurred, and no substantive rulings have been presented to or considered by the FINRA Panel. (Youngwood Decl. ¶ 6.)

B. **Procedural Background**

On August 24, 2012, one day before the deadline set by the FINRA Panel for asserting jurisdictional challenges, UBS filed a Complaint against Allina in this Court. [Docket No. 1] Count I of the Complaint seeks a declaratory judgment that FINRA lacks jurisdiction over the FINRA Arbitration initiated by Allina. Count II of the Complaint seeks a preliminary and permanent injunction prohibiting Allina from pursuing claims against UBS in the FINRA arbitration. On September 10, 2012, UBS filed the current motion for a preliminary injunction. [Docket No. 8]

9

## III. DISCUSSION

### A. Preliminary Injunction Standard

The Eighth Circuit Court of Appeals has established the standard for considering preliminary injunctions. Dataphase Sys. Inc. v. CL Sys., Inc., 640 F.2d 109, 113 (8th Cir. 1981) (en banc). This Court must consider (1) the threat of irreparable harm to the moving party if an injunction is not granted, (2) the harm suffered by the moving party if injunctive relief is denied as compared to the effect on the non-moving party if the relief is granted, (3) the public interest, and (4) the probability that the moving party will succeed on the merits. Id. "The very nature of the inquiry on petition for preliminary relief militates against a wooden application of the probability [of success on the merits] test." Id. at 113.

The movant carries the burden of establishing a preliminary injunction is appropriate. Lankford v. Sherman, 451 F.3d 496, 503 (8th Cir. 2006). "No single factor in itself is dispositive; in each case all of the factors must be considered to determine whether on balance they weigh toward granting the injunction." Calvin Klein Cosmetics Corp. v. Lenox Labs., Inc., 815 F.2d 500, 503 (8th Cir. 1987).

### B. Merits of Preliminary Injunction Motion

1. **Likelihood of Success on the Merits**

UBS asserts that it is likely to succeed on the merits because ARS issuers, like Allina, are not customers under the FINRA rules, and therefore, Allina cannot demand FINRA arbitration. UBS further maintains that even if Allina qualified as a customer, the forum selection clauses in the parties' agreements supersede any right that Allina may have to demand FINRA arbitration. The parties dispute centers on the interpretation and application of FINRA's definition of customer.

  a. **FINRA's Definition of Customer and Judicial Interpretations**

FINRA requires its member firms to resolve disputes with their customers in FINRA arbitration if the conditions in Rule 12200 are satisfied. FINRA Rule 12200 provides:

> Parties must arbitrate a dispute under the Code if:
> - Arbitration under the Code is either:
>   (1) Required by a written agreement, or
>   (2) Requested by the customer;
> - The dispute is between a customer and a member or associated person of a member; and
> - The dispute arises in connection with the business activities of the member or the associated person, except disputes involving the insurance business activities of a member that is also an insurance company.

The FINRA rules define "customer" in the negative: "[a] customer shall not include a broker or dealer." FINRA R. 12100(i).

In determining the scope of the "customer" definition, the Eighth Circuit rejected the argument that one may qualify as a customer merely by being neither a broker nor a dealer. Fleet Boston Robertson Stephens, Inc. v. Innovex, Inc., 264 F.3d 770, 772 (8th Cir. 2001). Instead, the Eighth Circuit defined customer to "refer[] to one involved in a business relationship with an NASD member that is related directly to investment or brokerage services."[1] Id. An individual or entity that solely receives financial advice, without investment or brokerage services, is excluded from the definition of "customer." Id. at 773.

Here, the Court finds that UBS provided more than financial advice, and the Court determines that Allina is a customer of UBS. Allina retained UBS to assist Allina in designing and executing the issuance of $475 million in bonds. UBS advised Allina on the structure of its financing and recommended the use of ARS. UBS served as an underwriter of the bond issuance and earned a fee for its services. UBS also agreed to serve as the lead broker-dealer for Allina's ARS auctions and earned a fee for these services. Pursuant to this agreement, UBS

---

[1] The NASD was the predecessor of FINRA. Berthel Fisher & Co. Fin. Servs., Inc. v. Larmon, 695 F.3d 749, 752 (8th Cir. 2012).

entered purchase and sell orders at the ARS auction on behalf of investors or potential investors in Allina's ARS. Further, UBS acted as Allina's agent in dealing with rating agencies and sold Allina interest rate swaps to support the ARS structure. In light of the business relationship between Allina and UBS, and the services paid for and received by Allina, the Court finds that Allina is a customer of UBS as the term is defined in FINRA Rule 12100(i).

The Court's decision is consistent with other courts' interpretations of "customer" in factual scenarios that are nearly identical to that presently before the court. See, e.g., Goldman, Sachs & Co. v. City of Reno, No. 3:12-cv-00327-RCJ-WGC, 2012 WL 5944966, at *7 (D. Nev., Nov. 26, 2012) ("[T]he FINRA member has provided more than financial advice, but rather has provided services directly related to the securities, i.e., facilitation of auctions of the securities themselves. The Court finds this to be sufficiently related to the broker-dealer function for the City [to] fall under the definition of "customer."); UBS Fin. Servs. Inc. v. City of Pasadena, No. CV 12-05019-RGK (JCx), 2012 WL 3132949, at *4 (C.D. Cal. July 31, 2012) ("Defendant hired Plaintiffs to perform the underwriting services on both of its ARS offerings. Given the business relationship existing between the two parties and the services received by

Defendant, the Court finds that Defendant is likely a customer of Plaintiffs as that term is defined in Rule 12100(i)."); UBS Fin. Servs. Inc. v. W. Va. Univ. Hosps., Inc., 760 F. Supp. 2d 373, 379 (S.D.N.Y. 2011) aff'd in part, vacated in part on other grounds 660 F.3d 643 (2d Cir. 2011) ("UBS has failed to present a 'strong prima facie case' evincing its likelihood of success on the question of whether Defendants qualify as 'customers' of UBS under the FINRA code."); J.P. Morgan Secs. Inc. v. La. Citizens Prop. Ins. Corp., 712 F. Supp. 2d 70, 78-79 (S.D.N.Y. 2010) ("[I]n light of the Second Circuit's instruction that 'any ambiguity in the meaning of 'customer' . . . should be construed in favor of arbitration, [the Court] determine[s] that an issuer is a customer of an underwriter.").

Most recently, the Fourth Circuit determined that an ARS issuer, like Allina, was a customer of UBS Financial Services Inc. and Citigroup Global Markets, Inc. See UBS Fin. Servs., Inc. v. Carilion Clinic, --- F.3d ----, 2013 WL 239051, at *6-7 (4th Cir. Jan. 23, 2013). The Fourth Circuit determined that a customer is "one, not a broker or a dealer, who purchases commodities or services from a FINRA member in the course of the member's business activities insofar as those activities are regulated by FINRA—namely investment banking and securities business activities." Id. at *6. The court concluded that the ARS

14

issuer, Carilion Clinic, was a customer within the meaning of the FINRA Rules and could demand arbitration, and therefore affirmed the district court's denial of the Plaintiff's motion for a preliminary injunction. Id. at *6-7.

The Court finds these decisions persuasive and consistent with its finding that Allina is UBS's customer.

### b. Forum Selection Clauses

UBS contends that the parties' Bond Purchase Agreement and Broker-Dealer Agreement respectively provide that all disputes arising out of and relating to those agreements must be resolved before a specific forum other than FINRA. UBS maintains that, pursuant to the Bond Purchase Agreement, the parties agreed that "[a]ny dispute or claim" arising between UBS and Allina "shall be finally settled by arbitration administered by the American Arbitration Association." UBS also maintains that the parties agreed that "all actions and proceedings" arising out of the Broker-Dealer Agreement "shall be brought in a New York State Court or United States District Court, in each case, in the County of New York." Because Allina states that its claims in the FINRA arbitration are based on UBS's "underwriting and broker/dealing" activities, UBS reasons that

15

any disputes regarding these activities should be resolved in the previously agreed-upon fora.

The Court disagrees with UBS and finds that UBS is not likely to succeed on the merits because the forum selection clauses at issue here do not supersede UBS's obligation to participate in FINRA arbitration. With respect to the Broker-Dealer Agreement, the Court agrees with the Fourth Circuit's interpretation of a similar forum selection clause in the Carilion Clinic case. 2013 WL 239051, at *7-9. Here, as in Carilion Clinic, the clause in the Broker-Dealer Agreement does not supersede, waive, or preclude the right to FINRA arbitration. Id. at *7 ("Any such provision, however, must be sufficiently specific to impute to the contracting parties the reasonable expectation that they are superseding, displacing, or waiving the arbitration obligation created by FINRA Rule 12200."). With respect to the forum selection clause in the Bond Purchase Agreement, the Court declines to reach the issue of whether the parties should participate in arbitration administered by the American Arbitration Association or by FINRA. The Court finds that this issue is procedural in nature and therefore is appropriate for arbitral resolution. Howsam v. Dean Witter Reynolds, Inc., 537 U.S. 79, 83-85 (2002); see also Cent. W. Va. Energy, Inc. v. Bayer Cropscience LP,

645 F.3d 267, 272-276 (4th Cir. 2011) ("Its argument therefore does not implicate <u>whether</u> to proceed by arbitration, but <u>which arbitration panel</u> should decide certain issues. CWVE's contention is far more akin to a venue dispute than a question of arbitrability, and, as such, it is appropriate for arbitral resolution.").

## 2. Irreparable Harm and Balance of Harms

A party suffers irreparable harm when it is required to arbitrate a dispute that it did not agree to arbitrate. <u>O.N. Equity Sales Co. v. Prins</u>, 519 F. Supp. 2d 1006, 1013 (D. Minn. 2007). In order to obtain a preliminary injunction, the moving party must show that "the harm to the plaintiff in the absence of a preliminary injunction outweighs the potential harm that granting a preliminary injunction may cause the defendant." <u>ASICS Corp. v. Target Corp.</u>, 282 F. Supp. 2d 1020, 1031 (D. Minn. 2003).

The Court finds that these factors also weigh in favor of Defendant. The record before the Court as of the date of oral argument shows that the parties have both actively participated in the FINRA arbitration. The record shows that: UBS submitted an Answer to Allina's Statement of Claim, both parties submitted arbitrator ranking forms, arbitrators were appointed, both parties participated in a pre-hearing conference with the FINRA arbitration panel where the parties

scheduled evidentiary hearings before the FINRA panel for August 5-13, 2013, and both parties served and responded to written discovery. Therefore, Defendant stands to suffer substantial harm if enjoined from continuing the arbitration of its claims, and these factors weigh against granting UBS a preliminary injunction.

### 3. Public Interest

Congress has expressed a "clear intent, in the [Federal] Arbitration Act, to move the parties in an arbitrable dispute out of court and into arbitration as quickly and easily as possible." Moses H. Cone Mem'l Hosp. v. Mercury Constr. Corp., 460 U.S. 1, 22 (1983); see also Fleet Boston, 264 F.3d at 773 ("[W]here the parties have agreed to arbitrate, there is a strong federal policy in favor of arbitration."). Here, because the Court finds the dispute arbitrable, public policy concerns weigh in favor of Defendant and against enjoining the arbitration.

Therefore, balancing the four Dataphase factors, the Court finds it must deny Plaintiff's motion for injunctive relief.

Accordingly, based upon the files, records, and proceedings herein, **IT IS**

**HEREBY ORDERED**:

Plaintiff's Motion for Preliminary Injunction [Docket No. 8] is **DENIED**.

Dated: February 11, 2013         s/ Michael J. Davis
                                 Michael J. Davis
                                 Chief Judge
                                 United States District Court